IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI-DADE DIVISION

CASE NO:

MARY PAT LETOURNEAU, ANDREY MORARU,
and HOUSING OPPORTUNITIES PROJECT
FOR EXCELLENCE, INC.,

    Plaintiffs

vs.

8200 BYRON AVE LLC, and ADAM DASH,

    Defendants
_____/

## COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

COMES NOW, the Plaintiffs, MARY PAT LETOURNEAU, ANDREY MORARU and HOUSING OPPORTUNITIES PROJECT FOR EXCELLENCE, INC. sues Defendants, 8200 BYRON AVE LLC, and ADAM DASH, and states as follows:

1. This is an action initiated for the denial of federally secured rights of fair housing. Plaintiffs seek declaratory and injunctive relief as well as damages and attorney's fees for the denial of equal housing opportunities based on national origin.

## JURISDICTION

2. This Court has jurisdiction pursuant to 42 U.S.C. §3613 as well as 28 U.S.C. § 1331 and 1343(a)(3) and (4). Claims are asserted pursuant to the Fair Housing Act, 42 U.S.C. §§3601, et seq., and to the extent that declaratory relief and supplemental jurisdiction is sought, claims are asserted pursuant to 28 U.S.C. § 1367 and §§2201-2202.

3. Venue is proper in this District under 28 U.S.C. § 1391 as this is the district in which the events giving rise to the Plaintiffs' claims occurred and as this is an action which is not founded solely on diversity of citizenship.

## PARTIES

4. The Plaintiff, ANDREY MORARU (hereinafter MORARU), is of Romanian ancestry. MORARU is a resident of Florida and is *sui juris*. He is of Moldovian ancestry and is a U.S. naturalized citizen. Grandfather and his side of the family back in the day.

5. The Plaintiff, MARY PAT LETOURNEAU (hereinafter LETOURNEAU), is a U.S. Citizen, originally from Chicago. LETOURNEAU is a resident of Florida and is *sui juris*.

6. Both MORARU and LETOURNEAU were perceived to be Romani and were discriminated against based upon this perceived race and national origin.

7. In the United States, there are close to a million Romani people in the US, with the largest clusters in Los Angeles, San Francisco, New York, Chicago, Boston, Atlanta, Dallas, Houston, Seattle and Portland. Anti-Roma discrimination pervades education, employment, housing and, most of all, policing, is as noteworthy as it is unreported.

8. Persecution of Romani people reached a peak during World War II in the Nazi genocide of Romanis during the Holocaust. The Romani communities in Central and Eastern Europe were less organized than the Jewish communities; and the Einsatzgruppen, mobile killing squads who travelled from village to village massacring the Romani inhabitants where they lived, typically left few to no records of the number of

Roma killed in this way. Historians estimate that between 1.5 million Romani were killed by the Germans and their collaborators.

9. In the United States during Congressional debate in 1866 over the Fourteenth Amendment to the United States Constitution which would subsequently grant citizenship to all persons born within U.S. territory, an objection raised was that a consequence of enacting the amendment would be to grant citizenship to Gypsies and other groups perceived by some as undesirable.

10. Today, the Romani community continues to experience acute prejudice today, as it has done for decades.

11. The Defendant, 8200 BYRON AVE LLC. is a Florida Limited Liability Company, licensed and doing business in Miami-Dade County Florida, that operates a property in Miami-Dade County that controls and operates an apartment building located at 8142 Byron Ave, in Miami Beach, Florida.

12. The Defendant, ADAM DASH, (hereinafter "DASH") is the owner of 8200 BYRON AVE LLC. and is the operator of the premises at 8142 Byron Ave, in Miami Beach, Florida.

13. The Plaintiff, HOUSING OPPORTUNITIES PROJECT FOR EXCELLENCE, INC. (hereinafter HOPE), is a private, Florida not-for-profit, 501 (c) 3 corporation established in 1988, one of three in Florida dedicated to eliminating housing discrimination and promoting fair housing. HOPE employs a three-tiered system of private enforcement, education outreach and counseling to achieve its mission to affirmatively further fair housing. Its programs are designed to ensure that people are offered the right to select housing of their choice without discrimination based on race,

religion, color, national origin, sex, disability, marital or familial status, or such other protected classes as may be conferred by federal, state, or local laws. HOPE is the only private not-for-profit fair housing organization in Miami-Dade and Broward Counties engaged in testing for fair housing law violations and pursuing enforcement of meritorious claims.

14. Throughout Miami-Dade and Broward Counties, HOPE engages in activities to identify barriers to fair housing practices, including practices that discriminate against persons because of race and national origin. As part of its mission to uncover housing discrimination, HOPE engages in education and outreach of housing providers, housing professionals, and lessees and buyers of property.

15. MORARU and LETOURNEAU came to Miami Beach in early February to put together a cabaret show at Faena Hotel in Miami Beach during the show creation period.

16. Because of the success of the show's premier and the prospect of it being a lengthy run, MORARU and LETOURNEAU sought to move from their apartment in Kansas City to Miami Beach by April 1, 2021.

17. In March, MORARU and LETOURNEAU started looking for an apartment in early March to move in by April 1st.

18. The listing agent for 8142 Byron Ave, Ray Weisbein showed them apartment #3. When they stated they were interested, Mr. Weisbein walked them through the application process, and they got approved by Defendant 8200 Byron Ave LLC the same night.

*LETOURNEAU v. 8200 BYRON AVE LLC.*
*COMPLAINT*
*Page 5 of 11*

19. MORARU and LETOURNEAU received the lease and agreed to the rent of $2,200. Mr. Weisbein texted them saying they would get the keys once they signed the lease and paid the deposit.

20. MORARU and LETOURNEAU signed the lease and sent a $ 6,300 deposit, and Defendant DASH signed the lease. The lease is attached hereto as Exhibit "A".

21. DASH contacted MORARU and LETOURNEAU within a few days and invited MORARU and LETOURNEAU to come to the apartment before April 1st so he can show them around and have a "real talk" first.



22. MORARU and LETOURNEAU go to 8142 Byron Ave to meet with DASH. DASH asks MORARU and LETOURNEAU about their professional background and whether they have any ulterior motives for coming to Miami.

23. DASH starts discussing a "gang of gypsies" from Sarasota who are involved in criminal activity around Miami, including human trafficking and drugs. DASH accuses MORARU and LETOURNEAU of being "gypsies" because they are performers and gypsies go around the world doing their street shows and kidnapping people to sell them into slavery.

24. DASH advised MORARU and LETOURNEAU that he looked up their "bloodlines" and they "have gypsies in [their] lineage."

25. DASH begins to become agitated and claims to work with the FBI "to help expose and put away criminals." Then DASH threatened "If I find out you're involved in any of this stuff, I'll fuck you up."

26. MORARU and LETOURNEAU were shocked and attempted to reassure DASH that they were not criminals and just want a good place to live. DASH shows them a picture of a woman who he claims is supposedly wanted by authorities and asks if they knew her. MORARU and LETOURNEAU denied knowing this person.

27. MORARU and LETOURNEAU continued to want to live in the unit because they were in the middle of an intense creation period for the upcoming show. Looking for a new apartment around town would be very taxing on their energy levels and time needed for rest and recovery. In order to have the concentration required to perform artistic and athletic feats safely to avoid injury, they needed peace of mind and the ability to focus.

28. While DASH appeared to be agitated, he advised them that MORARU and LETOURNEAU appeared to be on a "clean" side. They shake hands, and DASH assures them they can pick up the keys on April 1st.

29. The next day, MORARU and LETOURNEAU flew to Kansas City for a couple days to move out of their old apartment and hired a moving company to take their belongings to Miami.

30. On March 29th, DASH asked MORARU to call him in the morning.

31. When MORARU called DASH, DASH tells him that he had changed his mind and can't have MORARU and LETOURNEAU as tenants. DASH advised in order to receive his deposit back, they would need to email him saying he and all parties involved want to end the lease and then he would get his deposit back within 3 days.

32. When MORARU and LETOURNEAU did what was instructed to receive their $6,300 deposit, DASH emailed back:

To Andrey and Mary

Thank You for admitting your dishonesty and connection with the gypsy gang based out of Sarasota area, and your connection with Katherine Jo Ruiz. I am accept [sic] your apology and your termination of the lease. I will be forwarding all of this information to the correct Federal and State Agencies. Please act accordingly when they contact you. Thank You

Adam Dash

33. The realtor was copied on the email and called MORARU and LETOURNEAU asking what was going on and whether they were involved in something. They advised what had happened and Mr. Weisbein advised them to respond to the email and deny everything in writing, which they did. The reply from the landlord was: "You are now lying. It took you 2 hours to respond."

34. DASH never provided MORARU and LETOURNEAU their deposit.

35. Defendants' unlawful practices were designed with the intent to discourage, deny and limit available housing based on national origin, and are unlawful

under the Fair Housing Act and MORARU and LETOURNEAU have suffered injury in precisely the form the statute was intended to guard against.

36. By engaging in the unlawful conduct described above, Defendants acted intentionally, and maliciously to damage the rights and feelings of Plaintiffs in violation of the Fair Housing Act.

37. MORARU and LETOURNEAU have been, and continues to be, adversely affected by the discriminatory acts, policies, and practices of the Defendants.

38. HOPE was advised by its leadership of the National Fair Housing Alliance and other national entities regarding the need to cease this landlord's egregious discriminatory housing practices based on national origin and its effect on fair housing opportunity nationally.

39. Defendants' unlawful practices were designed with the intent to discourage, deny and limit available housing based on race and national origin.

40. The pattern and practice of discriminatory conduct, based on race and national origin, is based on egregious and outdated prejudice against the Romani peoples.

41. By engaging in the unlawful conduct described above, Defendants acted intentionally, and maliciously to damage the rights and feelings of Plaintiffs in violation of the Fair Housing Act.

42. In support of its goals, Plaintiff HOPE engages in a variety of educational, counseling and referral services, as well as community monitoring activities. The Education and Outreach Program offers to housing industry providers, condominium and homeowner associations, public housing authorities and not-for-profit Community Development Corporations, the most current information and technical assistance

necessary to fully comply with fair housing laws, consent decrees, enforcement agreements, Community Reinvestment Act regulations and affirmatively furthering fair housing and fair housing marketing requirements.

43. HOPE's time and scarce resources have been severely diverted and its mission frustrated in order to address the allegations outlined in this complaint, and in the previous lawsuit, and has resulted in expenditures which should have been used to affirmatively further fair housing without the cost of litigation.

44. HOPE has been, and continues to be, adversely affected by the discriminatory acts, policies, and practices of the Defendants.

45. As a result of the acts and conduct of the defendants, Plaintiff HOPE has suffered and continues to suffer interference with its mission, diversion of its resources and obstruction of its purpose of ensuring equal housing opportunities throughout South Florida free from race and color discrimination. Plaintiff HOPE has been, and continues to be adversely affected by the acts, policies, and practices of the Defendant and/or their agents.

46. Defendant's discriminatory actions have (1) interfered with the efforts and programs of HOPE which are intended to bring about equality of opportunity for all persons regardless of race or color; (2) forced HOPE to devote scarce resources to identify and counteract Defendants' unlawful housing practices and to otherwise divert those same resources from its education, counseling, and referral services; (3) interfered with the right of HOPE's constituents to enjoy the benefits of living in a community which does not discriminate against persons based on race or color; and, (4) frustrated HOPE's mission and purpose of promoting the equal availability of housing to all

persons without regard to race, color, religion, gender, national origin, familial status, or disability.

47. Plaintiffs have retained Disability Independence Group, Inc. and have agreed to pay the firm for their reasonable fees and costs incurred herein.

**CAUSE OF ACTION**
**COUNT ONE- VIOLATION OF THE FAIR HOUSING ACT – Section 804(a)**

48. Plaintiffs repeat the allegations contained in paragraphs one through 42 as fully set forth herein.

49. Defendant has engaged in discrimination on the basis of perception of race and national origin by otherwise making unavailable or denying, a dwelling to any person because of national origin and race.

50. Defendants has outright denied a unit to MORARU and LETOURNEAU, when, in fact, the unit remains available for prospective tenants who were not perceptions of Romani lineage.

50. Because of national origin, color and religion, Defendants have restricted the choices of persons by word or conduct in connection with seeking, negotiating for, and renting dwellings. Such acts perpetuate segregated housing patterns in the City of Miami and discourage and obstruct choices in the community.

WHEREFORE, Plaintiff, MARY PAT LETOURNEAU, ANDREY MORARU and HOUSING OPPORTUNITIES PROJECT FOR EXCELLENCE, INC., respectfully prays that this Court grants the following relief against Defendants, 8200 BYRON AVE LLC, and ADAM DASH, INC., including entering a declaratory judgment, pursuant to Rule 57 of the Federal Rules of Civil Procedure, stating that Defendants' practices,

policies and procedures have subjected Plaintiffs to discrimination in violation of the Fair Housing Act and permanently enjoining the Defendants:

a. To cease discrimination against Plaintiff and other individuals with on the basis of national origin, color and religion;

b. To ensure that a management company is retained who can manage the property in trust for Defendants;

c. Award actual and punitive damages to plaintiffs;

d. Award reasonable costs and attorneys' fees; and

e. Award any and all other relief that may be necessary and appropriate.

**THE PLAINTIFFS DEMAND A JURY TRIAL FOR ALL SUCH ISSUES SO TRIABLE IN THIS MATTER.**

Dated this 10th day of August, 2021.

> By: /s/ Matthew W. Dietz
> Matthew W. Dietz, Esq.
> Florida Bar No.: 0084905
> DISABILITY INDEPENDENCE GROUP, INC.
> 2990 Southwest 35th Avenue
> Miami, Florida 33133
> Telephone: (305) 669-2822
> Facsimile: (305) 442-4181
> mdietz@justdigit.org
> aa@justdigit.org